IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RACHEL POPE | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 21-3515 |
| | § | |
| BAYLOR COLLEGE OF MEDICINE | § | |
| | § | JURY TRIAL DEMANDED |
| *Defendant.* | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW Dr. Rachel Pope ("Pope" or "Plaintiff"), and complains of Baylor College of Medicine ("BCM" or "Defendant"), and for his cause of action would respectfully show the Court as follows:

### I. SUMMARY

1. This is a sex/pregnancy discrimination and retaliation case, brought under Title VII of the Civil Rights Act of 1964, as amended.

2. BCM failed to maintain a workplace free of unlawful discrimination and retaliation. Despite multiple reports and complaints, it has allowed sexual harassment to permeate among doctors, faculty, and staff. Instead of investigating or fixing the problem, BCM treated Pope worse than male doctors and retaliated against her for reporting sex discrimination/harassment and a hostile work environment. In fact, BCM notified Pope that it was non-renewing her contract just a few days after she informed her supervisor that she was pregnant and a few weeks after she reiterated the discriminatory and harassing treatment occurring in the workplace.

1

## II. PARTIES

3. Plaintiff Rachel Pope is an individual currently residing in Ohio.

4. Defendant Baylor College of Medicine is a nonprofit corporation with a principal place of business in Harris County, Texas.  BCM may be served with process by serving its registered agent, James Banfield, Baylor College of Medicine, One Baylor Plaza, Suite 106A, Houston, Texas 77030.

## III. NATURE OF ACTION

5. This is an employment discrimination and retaliation case filed under Title VII of the Civil Rights Act of 1964, as amended, to recover damages owed by BCM to Pope.  *See* 42 U.S.C. § 2000e *et. seq*.

## IV. JURISDICTION AND VENUE

6. This Court has federal question jurisdiction under 28 U.S.C. § 1331.

7. Venue of this action is proper in this district and division under 28 U.S.C. § 1391(b)(1) and (b)(2) because BCM has a principal place of business in the Houston Division of the Southern District of Texas and/or a substantial part of the events or omissions giving rise to Pope's claims occurred in the Southern District of Texas.

## V. FACTUAL BACKGROUND

8. BCM is headquartered in Houston, Texas.

9. BCM has a legal responsibility to maintain a workplace free of unlawful discrimination and retaliation.

10. BCM must protect its employees from unlawful discrimination and retaliation.

11. Pope has a Bachelor of Arts and a Master's in Public Health.  She received her medical degree in 2011.  She completed her internship and residency at Case Western Reserve University in Obstetrics and Gynecology, and then joined BCM as a fellow, working in its Department of

Obstetrics and Gynecology, Division of Global Women's Health. She completed her fellowship in 2017.

12. Pope joined the faculty of BCM as a tenure-track assistant professor in obstetrics and gynecology on August 1, 2017 via a two-year contract that automatically renewed on an annual basis. She worked with BCM's global women's health program and spent much of her professional time working on surgically repairing obstetric fistulas in Malawi, Africa.

13. Pope also worked as the fellowship director for BCM's global women's health program, successfully recruiting highly skilled physicians. She also initiated a global women's health residency track where residents could spend six months of residency in Malawi.

14. Pope also raised funds for local relief work in Malawi.

15. During her time in Malawi, Pope worked with Dr. Jeffrey Wilkinson and Dr. Ibezimako Iwuh, both of whom are male and still employed by BCM.

16. Wilkinson was Pope's supervisor.

17. While in Malawi, at least three female staff members – Dr. Meghan Prin, Dr. Clare Algeo, and Rose Sulentic – complained to Pope about sexist and hostile interactions with Iwuh. Specifically, these staff members reported that Iwuh engaged in demeaning and threatening treatment of female faculty and staff.

18. Examples of these staff members' concerns include the following: 1) Iwuh looking at nude photographs of women on his phone during work hours; 2) Iwuh bullying female staff members and demeaning their credentials as doctors; 3) Iwuh physically threatening a female anesthetist; and 4) Iwuh failing to attend scheduled meetings with female staff members.

19. Iwuh also stated to Pope's one-year old daughter: "I will say goodbye to you differently when you are eighteen."

20. In June 2019, Pope reported these issues about Iwuh to Adam Gibson and Taylor Napier, who stood-in for Wilkinson during Wilkinson's leave-of-absence.[1] Pope also requested that no female junior faculty or trainees be placed under his supervision. Pope then reported these issues about Iwuh directly to Wilkinson in August 2019, after he returned from leave.

21. Also in August 2019, Pope reported the issues about Iwuh to Dr. Ronald Mataya, who is an associate professor for BCM. Mataya also reported these concerns to Wilkinson.

22. BCM did not investigate these allegations about Iwuh. Instead, BCM (including Wilkinson) continued to support Iwuh.

23. Prin and Algeo left BCM in 2019.

24. Sulentic left Malawi in 2019, and then left BCM in 2020.

25. None of the BCM female American faculty who were in Malawi in 2019 are on staff anymore.

26. Iwuh continues to work for BCM in the same position. Due to BCM's failure to reprimand or discipline Iwuh, it is likely that Iwuh has continued to harass other female employees and staff members.

27. BCM does not care that Iwuh harasses female employees and staff members.

28. Wilkinson had an inappropriate relationship with a female staff member working at the clinic in Malawi. BCM was aware of this relationship. At least in 2019, this relationship created an uncomfortable work environment among female staff members working in Malawi.

29. In June 2019, Pope notified Dr. Michael Belfort (Chair of the OB/GYN Department) that her husband had received a job offer that would require a temporary move to Cleveland, Ohio. Therefore, Pope and Belfort discussed scheduling her work so that she could live in Cleveland,

---

[1] Gibson and Napier were/are employed by Texas Children's Hospital but affiliated with BCM.

where she could work part of the time remotely, but also travel to work in Houston and Malawi. BCM allows male doctors and faculty to work remotely and travel.

30. Throughout the summer of 2019, Pope had discussions with several BCM representatives, including Belfort, Wilkinson, and Margaret (Meg) Ferris, about her work plan for splitting time between Cleveland, Houston, and Malawi. Several of these discussions were documented by email. Ferris is the Administrator of the OB/GYN Department and primarily works in Houston.

31. These discussions also included Wilkinson requesting that Pope spend one week per month in Houston, to which Pope agreed. Wilkinson approved Pope's work plan.

32. BCM also indicated that it would provide her with a new contract.

33. Accordingly, Pope began working under the terms of her approved work plan in about August 2019.

34. Pope even attended a post-graduate course on vulvar disorders from September 16-20, 2019, in preparation of working in a clinic in Houston with Dr. Kelly Hodges.

35. Pope made trips to Houston between October and early December 2019.

36. Pope and Ferris exchanged emails in late September and early October 2019 about BCM providing a new contract to Pope and Pope formally applying for the Associate Professor position. Regarding the anticipated contract, Ferris even commented "I think you will be happy!"

37. But the contract never came, even though Pope continued to work under the planned arrangement.

38. Pope traveled to Malawi from November 1 – 17, 2019, where she performed surgeries and taught.

39. On November 15, 2019, Pope had a meeting with Ferris regarding her contract, as Ferris made a visit to Malawi while Pope was working there. In addition to discussing her work plan, Pope also reiterated her concerns about the hostile work environment for women staff members working in Malawi, especially considering BCM had apparently not done anything to rectify the situation. Pope also told her about the lack of responses from Wilkinson in regard to the women and the discomfort the women had expressed with the relationship at the workplace. In that same meeting, Pope asked Ferris if the delay in her contract was in retaliation for raising concerns about the hostile work environment in Malawi. In response, Ferris invoked her own experience regarding colleagues having affairs and why she chose "not to speak about it." She then told Pope that she was replaceable and that the work could be completed by other staff.

40. Nevertheless, as of November 2019, BCM still did not conduct an investigation into Pope's concerns about discrimination and sexual harassment in the work place.

41. BCM accommodated Wilkinson's request for a leave of absence and then later a request to permanently relocate to Malawi.

42. Pope was scheduled to meet with Belfort several times between late November and early December 2019; however, each time Belfort cancelled the planned meeting.

43. Instead, on December 4, 2019, Pope met with Ferris and Mike Mizwa (BCM's Director of Special Projects). During this meeting, Ferris suggested that Pope did not actually want to come to Houston at all, in contradiction to numerous prior discussions over the proceeding months. This comment surprised Pope, as it was not true. Pope reiterated her intent to come to Houston as necessary, as she had been planning and doing so.

44. On December 9, 2019, Pope sent Wilkinson an email informing him that she was pregnant, and that she would still be able to do her work.

45. On December 12, 2019, Belfort sent Pope an email terminating her. In this email, Belfort indicated he discussed Pope's "unique situation" with several individuals, including Wilkinson, Mizwa, and Ferris, and stated that BCM's "program will be best served by focusing our efforts and philanthropic funding on Malawian and Malawi-based faculty and staff, and by building local capacity, thus ensuring sustainability," and that "since you will no longer be in Malawi full time, we will not be renewing your contract." This message contracted many prior representations made by BCM.

46. Attached to Belfort's December 12, 2019 email was a termination letter stating, in part, that "[d]ue to your relocation to Cleveland, your primary appointment as Assistant Professor in the Department of Ob/Gyn at [BCM] will expire on March 6, 2020."

47. According to the December 12, 2020 email, BCM attempted to utilize the 90-day notice period referenced in her contract to give her the March 6, 2020 ending date; however, the calculation was incorrect, as that was less than 90 days. Accordingly, BCM did not comply with the contract because it did not give her the requisite notice.

48. Furthermore, the email and termination letter contained false or misleading statements for several reasons, including the following:

   a. BCM had repeatedly reassured Pope that her temporary relocation would not affect her position.

   b. BCM had repeatedly allowed male colleagues to work remotely without any problems.

   c. For example, BCM allowed Wilkinson to work full-time while based in Fresno, California and then to permanently relocate to Malawi.

   d. As another example, Mataya is an OB/GYN at BCM, and lives in California, and spends most of his professional work time between California and Malawi.

    e. As another example, Dr. Steven Clark is also an OB/GYN at BCM, but does not live in Houston.  BCM allows him to travel to Houston to do his work, which is what Pope was willing to do.

    f. As another example, Dr. Ken Moise is an OB/GYN who previously worked at BCM. He never resided in Houston during his time with BCM.

49. In short, BCM always readily accommodated Pope's male colleagues who did not live in Houston.

50. Therefore, Pope was not in a "unique situation"… other than the fact that she was female, pregnant, and/or complained about a hostile or discriminatory work environment.

51. Pope filed a charge of discrimination with the EEOC on or about June 11, 2020, alleging sex/pregnancy discrimination and retaliation.

52. On or about September 2, 2020, BCM submitted a response or position statement to Pope's EEOC charge.

    a. The response/position statement was written by Dane Friend.

    b. The response/position statement stated, in part, that BCM "did not approve [Pope] to work full-time from Cleveland," that it allegedly "tried to work out a schedule where she could travel back to Houston to fulfill the duties of the position," and that "[a]fter not being able to work out a partially remote working arrangement, the College had no choice but to non-renew the contract."  These are false statements.

    c. The response/position statement also included an "Internal Investigation Report" dated March 6, 2020 and written by Shanika Brooks, Senior Employee Relations Business Partner.  This report contains several inaccurate or misleading statements, but most notably the following statements are false:

      i. "Ms. Ferris and Dr. Belfort worked with Dr. Pope to identify a Houston-based clinical role that could serve as a replacement provision of clinical and surgical care in Malawi. Unfortunately, Ms. Ferris said Dr. Pope rejected this option because she was not willing to travel regularly to Houston to practice clinical medicine."

      ii. "… Ms. Ferris and Dr. Belfort were unable to negotiate a reasonable working plan with Dr. Pope."

      iii. "…Dr. Pope was unwilling to fulfill the work requirement proposed by the department."

  d. The response/position statement also stated that BCM "was not previously aware of" Pope's claims of retaliation for opposing sexual misconduct in Malawi. But this is a false statement for at least the following reasons:

      i. As referenced above, Pope repeatedly reported the sex-based misconduct to various BCM representatives.

      ii. On or about March 16, 2020 (approximately 6 months before BCM submitted its response/position statement to the EEOC), Pope's prior attorney sent a letter to Robert Corrigan, BCM's General Counsel and Senior Vice President, specifically referencing Pope's reports. This was a follow-up to a phone call between Pope's prior attorney and Corrigan. Such communications were sufficient to put BCM on notice about the retaliation allegations sexual harassment/misconduct allegations. Regardless, it appears that BCM has not done any investigation into Iwuh's conduct.

53. Ultimately, BCM's position statement to the EEOC contained false, inaccurate, and/or misleading statements.

54. The EEOC issued a right-to-sue notice dated July 29, 2021.  This lawsuit is being filed within 90 days of receipt of that notice.

55. BCM did not adequately train its employees on anti-discrimination and anti-retaliation related employment laws and policies.

56. BCM did not take steps to prevent discrimination and retaliation in the workplace.

57. BCM did not act in good faith.

58. BCM's unlawful actions were willful and/or committed with reckless disregard of the law.

59. BCM's actions were committed with malice.

60. BCM's unlawful actions caused Pope to suffer mental anguish, pain and suffering, damage to her reputation, loss of earning capacity, loss of professional standing, loss of enjoyment of life, inconvenience, lost back pay, loss of benefits, and other damages.

## VI. CAUSES OF ACTION

61. Pope hereby incorporates, by reference, the preceding paragraphs as if fully set forth herein and asserts the following causes of action under Title VII of the Civil Rights Act of 1964.  *See* 42 U.S.C. § 2000e *et. seq*.

    **A.  Sex discrimination**

62. BCM discriminated against Pope based on her sex (female) when it terminated her and/or non-renewed her contract.

    **B.  Pregnancy discrimination**

63. BCM discriminated against Pope based on her pregnancy when it terminated her and/or non-renewed her contract.

    **C.  Retaliation**

64. BCM retaliated against Pope for opposing discriminatory acts that took place at work.

## VII. Jury Demand

65. Pope demands a trial by jury.

## VIII. Damages

66. As a result of the above mentioned actions, Pope seeks the following damages:

    a. Back pay;

    b. Loss of benefits;

    c. Loss of earning capacity;

    d. Reinstatement or, in the alternative, front pay;

    e. Loss of enjoyment of life;

    f. Loss of reputation;

    g. Loss of career and academic opportunities;

    h. Inconvenience;

    i. Injunctive relief;

    j. Mental anguish and emotional distress;

    k. Compensatory damages;

    l. Punitive or exemplary damages;

    m. Reasonable and necessary attorneys' fees;

    n. Court costs;

    o. Prejudgment and post-judgment interest;

    p. Any and all other damages and/or relief, equitable or otherwise, to which Pope may be entitled under federal law.

## IX. Prayer

Wherefore, premises considered, Pope respectfully prays that BCM be cited to appear and answer herein and that upon a final hearing of this action, judgment be entered for Pope against BCM

for damages in an amount within the jurisdictional limits of this Court, which shall include all above mentioned damages and any other relief, at law or in equity, to which Pope may be entitled.

        Respectfully submitted,

        SUD LAW P.C.

        */s/ Nitin Sud*
        Nitin Sud
        State Bar No. 24051399
        Federal ID No. 611307
        6750 West Loop South
        Suite 920
        Bellaire, Texas 77401
        Phone: 832-623-6420
        Fax: 832-304-2552
        Email: nsud@sudemploymentlaw.com

        *Attorney for Plaintiff*